**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAMONA J. CHERY NOLASCO,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 21-CV-4119** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **April 3, 2023**

Plaintiff Ramona J. Chery Nolasco brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying her claim for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 11381-1383f.  This matter is before me for disposition of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 13) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.


I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed for SSDI and SSI benefits on September 24, 2016, alleging disability since April 27, 2011 due to depression and conditions of the back, left wrist, left knee, and neck.  (R. 81-82, 96-97, 354-72).  Her applications were denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 81-112, 182-84).  Plaintiff, represented by counsel, and a vocational expert ("VE") testified

at an administrative hearing on November 15, 2018.  (R. 46-65).  On December 11, 2018, the

ALJ issued an unfavorable decision.  (R. 113-35).  Plaintiff appealed, and, on June 27, 2019, the

Appeals Council vacated and remanded on the grounds that the ALJ improperly applied the

doctrine of res judicata and did not properly formulate a mental limitation.  (R. 137-38).  The

Appeals Council remanded for the ALJ to undertake a further evaluation of Plaintiff's mental

impairments and her maximum residual functional capacity ("RFC"), and, if warranted by the

expanded record, obtain supplemental evidence from a VE to clarify the effect of the assessed

limitations on Plaintiff's occupational basis.[1]  (R. 138).

On February 20, 2020, Plaintiff (who was represented by counsel) and a VE testified

before the ALJ.  (R. 66-80).  On February 28, 2020, the ALJ issued another unfavorable

decision.  (R. 28-39).  Plaintiff appealed, and the Appeals Council denied review on July 15,

2021, making the ALJ's decision the final decision of the Acting Commissioner for purposes of

judicial review.  (R. 1-8).

Plaintiff filed her Complaint in the United States District Court for the Eastern District of

Pennsylvania on September 17, 2021.  (Compl., ECF No. 1).  On November 5, 2021, Plaintiff

was deemed to have consented to my jurisdiction pursuant to 28 U.S.C. § 636(C).  (Consent

Order, ECF No. 5).  On April 21, 2022, Plaintiff filed a Brief and Statement of Issues in Support

of Request for Review, and the Acting Commissioner filed its response on May 25, 2022.  (Pl.'s

Br., ECF No. 13; Def.'s Br., ECF No. 16).  On June 8, 2022, Plaintiff filed a reply.  (Pl.'s Reply

Br., ECF No. 17).

---

[1]  The errors identified by the Appeals Council are not at issue in the instant proceeding.

II.    **FACTUAL BACKGROUND**[2]

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on January 3, 1976 and was thirty-five years old on her disability onset date. (R. 402). She completed seventh grade and cannot communicate, and is illiterate, in English. (R. 37, R. 407). She previously worked as a cleaner and maintenance worker. (R. 37).

A.    **Medical Evidence**

Plaintiff was evaluated by Maria Sesin, Ph.D., of Behavioral Medical Associates, on November 1, 2011 in connection with a work-related physical injury. (R. 505). She presented with complaints of irritability, fatigue and moodiness, loss of social interest, periods of crying and depression, appetite and sleep disturbance, anxiety and fearfulness, loss of hobbies and interests, and ongoing thoughts about the work-related incident, loss of libido, and loss of motivation. (R. 506). She also complained of decreased attention and concentration and problems with learning and memory, which were secondary to her physical pain and emotional distress. (*Id.*). Plaintiff was fully oriented, cooperative and calm, well groomed, spoke normally without any evidence of a thought disorder in her presentation, and demonstrated a good general fund of information and abstract reasoning ability. (*Id.*). Presenting an appropriate affect, she denied suicidal ideation or intent, although she did indicate passive suicidal ideation. (R. 505-06). Dr. Sesin diagnosed major depressive episode, severe. (*Id.*). She opined that Plaintiff was

---

[2] Because the Court's ruling on this matter implicates only the ALJ's analysis at step three of the five-step sequential evaluation, regarding whether Plaintiff's mental impairments meet the criteria for Listing 12.04 (depressive, bipolar and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders), the Court summarizes only the evidence relevant to these listings.

suffering from a psychological injury and would benefit from cognitive behavioral therapy. (*Id.*).

On August 8, 2014, Moses Weksler, Ph.D., of Integral Consulting Services, Inc. performed an independent psychological evaluation of Plaintiff in connection with Plaintiff's New York Worker's Compensation claim. (R. 509-13). Dr. Weksler noted that Plaintiff's appearance was casual, she was cooperative, her thought processes evidently were not impaired, and she was free of hallucinations, delusions, or suicidal or homicidal ideation. (R. 512). However, Plaintiff's affect was restricted, she had a depressed mood, her speech was somewhat pressured, and her self-perception was impaired. (*Id.*). Dr. Weksler diagnosed adjustment disorder with depression, opined that "[t]here is a temporary mild to moderate partial causally related disability," and recommended that Plaintiff continue to see a psychologist on a weekly basis for ten weeks. (R. 513).

From January 2014 through May 2016, Roy Aranda, Psy.D., J.D., provided psychological therapy to Plaintiff in connection with her Worker's Compensation claim. (R. 518-26, 529-32, 537-43, 548-49, 554-57, 590-614). Over the course of her treatment, Plaintiff attended sixteen therapy sessions. (R. 519, 521, 523-24, 526, 530, 532, 538-43, 549, 555, 557). The progress notes for the therapy sessions indicated that Plaintiff consistently presented with multiple symptoms or complaints, including anxiety and depression. (*Id*). The therapy consisted of both "supportive therapy" and "anxiety management." (*Id.*). During her sessions, Plaintiff discussed various issues, including her struggles with depression and anxiety, her physical pain, the Worker's Compensation and SSDI proceedings, and her move to Pennsylvania and its possible ramifications. (*Id.*). Completing "Attending Psychologist's Report" forms for the State of New York Workers' Compensation Board, Dr. Aranda indicated that Plaintiff "presents Major

Depressive Disorder, Severe . . . On a Severe range, are significant for anxiety and depression"
and that she had "a partial, marked psychological disorder." (R. 518, 520, 522, 525, 529, 531,
537, 548, 554, 556).

From February 2013 through June 2017, psychiatrist Luz Alvarez, M.D., treated Plaintiff.
(R. 615-29, 897-905). In multiple "Doctor's Progress Reports" for the New York Workers'
Compensation Board, Dr. Alvarez diagnosed major depressive disorder with psychosis. (R. 509-
10, 527-28, 533-36, 544-47, 550-53, 558-59). According to Dr. Alvarez, Plaintiff continued to
complain of feeling depressed and psychotic, was receiving pharmacological treatment to
alleviate her depressive and psychotic symptoms, and there were no significant changes to her
mental status. (*Id.*). She opined that Plaintiff could not return to work because of her symptoms.
(*Id.*).

Over the course of Plaintiff's treatment, Dr. Alvarez prescribed Elavil, Thiamine,
Neurontin, Prozac, Trazadone, Vistaril, and Zyprexa. (R. 615-29, 897-905). Plaintiff normally
saw Dr. Alvarez on a monthly basis. (R. 615-29, 903-05). According to Dr. Alvarez's treatment
notes, Plaintiff complained about depression, an inability to do anything at home, the lack of a
desire to socialize, frustration, fear about her medical conditions, irritability and anger, inability
to concentrate, anxiety, feelings of uselessness, inability to sleep, concentration issues, and
similar problems. (R. 615-29, 903-05). Her complaints typically referred to a triggering event,
such as an upcoming Worker's Compensation hearing, a family emergency, back pain, or other
medical problems. (*Id.*). Dr. Alvarez's mental health examinations showed that Plaintiff's mood
was consistently depressed, frustrated, and anxious, and, over the course of her treatment, she
was also fearful, worried, and felt useless and worthless. (*Id.*). The examination results were
otherwise normal. (*Id.*). At the September 16, 2016 session, which followed a summer-long

visit to her family in the Dominican Republic, Plaintiff "mood appears brighter."  (R. 624-25).

However, at her next appointment on October 11, 2016, Plaintiff once again "states that she is

feeling depressed," and "[h]er mood [was] depressed."  (R. 625).

On February 22, 2013, Dr. Alvarez filled out a "Medical Assessment of Ability to Do

Work Related Activities (Mental)" form ("MSS").  (R. 630-31).  Under the "Making

Occupational Adjustments" category, the treating psychiatrist opined that Plaintiff had a poor

ability to deal with the public and with work stresses, to function independently, and to maintain

attention and concentration.  (R. 630).  According to Dr. Alvarez, Plaintiff had a fair ability to

relate to co-workers and to interact with supervisors and a good ability to follow work rules and

to use judgment.  (*Id.*).  Observing that Plaintiff had depression and psychosis, Dr. Alvarez

opined that Plaintiff had a poor ability in "Making Performance Adjustments."  (R. 631).  She

also indicated that Plaintiff had a fair ability in "Making Personal-Social Adjustments."  (*Id.*).

Dr. Alvarez added under the "Work-Related Activities" category that Plaintiff was clinically

depressed.  (*Id.*).

On July 30, 2014, Dr. Alvarez completed another MSS form.  (R. 634-635).  She opined

that Plaintiff possessed poor or no ability to follow work rules, to relate to co-workers, to interact

with supervisors, to deal with work stresses, to function independently, and to maintain

attention/concentration.  (R. 634).  Dr. Alvarez also indicated that Plaintiff had a fair ability to

deal with the public and to use judgment.  (*Id.*).  Plaintiff had poor (or no) ability in "Making

Performance Adjustments."  (R. 635).  As limitations and medical or clinical findings supporting

her assessment of Plaintiff's performance adjustments, the treating psychiatrist listed

"[f]orgetful, unable to concentrate," and hallucinations.  (*Id.*).  Her ability to maintain personal

appearance and to demonstrate reliability were marked as "Fair" while her ability to behave in an

emotionally stable manner and to relate predictably in social situations were marked as "Poor or None." (*Id.*). Noting that Plaintiff had depression, psychosis, and chronic pain, Dr. Alvarez also indicated as to other work-related activities that could be affected that Plaintiff was unable to concentrate. (*Id.*).

At the Commissioner's request, Clementina Porcelli, Ph.D., performed a psychological examination of Plaintiff on November 11, 2016. (R. 636-40.) Plaintiff presented with complaints of waking up frequently throughout the night (between two to three times) and poor appetite with no significant weight loss reported. (R. 637). "Depressive symptomatology includes dysphoric mood, psychomotor retardation, crying spells, loss of usual interests, irritability, fatigue, loss of energy, concentration difficulties, diminished sense of pleasure, and social withdrawal." (*Id.*). Her "[a]nxiety-related symptomatology includes excessive apprehension and worry, nightmares, restlessness, difficulty concentrating, and muscle tension." (*Id.*). Her cognitive symptomatology consisted of short and long-term memory deficits, concentration difficulties, and difficulty learning new material. (*Id.*). Dr. Porcelli noted that Plaintiff's posture was slouched, her motor behavior was lethargic, and the quality of her speech was monotonous. (R. 638). Plaintiff's affect was also depressed, and her mood was dysthymic. (*Id.*) Furthermore, attention and concentration were mildly impaired on account of emotional distress resulting from the diagnosis of depression. (*Id.*). Her recent and remote memory skills were mildly impaired for the same reasons. (*Id.*) Cognitive functioning was below average to borderline (with general fund of information somewhat limited), and Plaintiff's insight and judgment were poor. (R. 638-39). The results of the mental health examination were otherwise normal. (R. 637-38).

Dr. Porcelli opined that Plaintiff can follow and understand simple directions and instructions without limitation and perform simple tasks independently without limitation. (R. 639). "She is moderately limited with regard to maintaining attention and concentration." (*Id.*) In addition, Plaintiff "is mildly limited" as to learning a new task, maintaining a regular schedule, and performing complex tasks independently, "and can benefit from supervision." (*Id.*). She had no limitation as to making appropriate decisions, was mildly limited with regard to appropriately dealing with others, and had a moderate limitation with regard to appropriately dealing with stress. (*Id.*). According to Dr. Porcelli, Plaintiff's difficulties were caused by her depression and anxiety and may significantly interfere with her ability to function on a daily basis. (*Id.*). Providing a guarded prognosis, Dr. Porcelli ultimately made a diagnosis of major depressive disorder, recurrent episodes, and unspecified anxiety disorder and recommended that Plaintiff continue with her psychological and psychiatric treatment. (R. 639-40).

State agency psychologist T. Harding, Ph.D., opined on November 16, 2017 that Plaintiff "retains the ability to perform the basic mental demands of unskilled work." (R. 93). As to Plaintiff's "understanding and memory limitations," Plaintiff was not significantly limited in her ability to remember locations and work-like procedures and to understand and remember very short and simple instructions and had a moderate limitation in her ability to understand and remember detailed instructions. (R. 91). With respect to limitations in sustained concentration and persistence, Dr. Harding opined that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, and to make simple work-related decisions and complete a normal workday and workweek without interruptions, and perform at a consistent rate without an unreasonable number and

8

length of rest periods.  (R. 91-92).  Her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were marked as moderately limited.  (R. 91).  Under the categories of "social interaction limitations" and "adaption limitations," Dr. Harding rated Plaintiff's abilities as not significantly limited, except for her ability to respond appropriately to changes in the work setting, which was rated as moderately limited.  (R. 92).  Dr. Harding further opined that Plaintiff had mild restrictions in her activities of daily living ("ADLs") and no episodes of decompensation.  (R. 87).

In his notes, Dr. Harding observed that Plaintiff claimed she had depression, although her examination results were largely normal.  (R. 92-93).  Dr. Harding diagnosed depressive disorder and anxiety.  (*Id.*).

Dr. Alvarez completed a third and final MSS on March 28, 2017.  (R. 664-65).  In the area of understanding, remembering, and applying information, the treating psychiatrist opined that Plaintiff had extreme limitations in her ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions.  (R. 664).  Plaintiff had marked limitations in her ability to understand and remember simple instructions, to carry out simple instructions, and to make judgments on simple work-related decisions.  (*Id.*).  According to Dr. Alvarez, in the area of interacting with others, Plaintiff possessed marked limitations in the ability to interact appropriately with supervisors and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting.  (R. 665).  Her ability to interact appropriately with the public was marked as moderately limited.  (*Id.*).  Dr. Alvarez also stated that there were no "other capabilities (such as the abilities to concentrate, persist, or maintain pace and adapt or manage oneself) affected by the

impairment." (*Id.*).  For support, Dr. Alvarez indicated that Plaintiff was clinically depressed and had psychosis and anxiety with a history of psychiatric illness since 2011.  (*Id.*)  She noted that the limitations began in 2013.  (R. 665-66).

On January 16, 2018, Plaintiff presented to Easton Hospital's emergency department, saying that "she has been hearing voices telling her to kill herself."  (R. 826).  She said that she felt hopeless or helpless and her plan included harm to others.  (R. 827).  According to the examination notes, Plaintiff presented with suicidal ideation, claiming that she was hearing voices telling her to kill.  (R. 823).  Plaintiff was found to be alert, oriented, and cooperative with an appropriate mood and affect.  (R. 822, 824).  She had symptoms of "paranoid suicidal thoughts" and anxiety.  (R. 823-24).  Her toxicology report was negative.  (R. 893-94).

Diagnosed at Easton Hospital with an acute psychiatric disorder and auditory hallucinations (R. 822, 828), Plaintiff was admitted to Brook Glen Behavioral Hospital on January 17, 2018 (R. 939-57).  She presented with complaints of depression, anxiety, poor sleep, auditory hallucinations, and suicidal ideation.  (R. 945, 952).  Plaintiff reported having a plan to kill herself by overdosing on her medications, although she did not have an organized means to execute the plan.  (*Id.*).  In addition, Plaintiff's mood was sad, depressed, and anxious, she had a constricted affect, her speech was slow, at a low tone, she was "selectively mute," her insight and judgment were limited, and she had suicidal ideation.  (R. 947, 952).  The mental health examination was otherwise normal.  (*Id.*).

At Brook Glen Behavioral Hospital, Plaintiff was diagnosed with major depressive disorder, recurrent, severe, with psychotic features, and there was also a rule-out diagnosis of posttraumatic stress disorder.  (R. 953).  Plaintiff received inpatient treatment and therapy and was administered Neurontin, Prozac, Trazadone, and Zyprexa.  (R. 953-54).  Her condition

improved over the course of her hospitalization.  (*Id.*).  Discharged on January 30, 2018, she was

to receive follow-up treatment from the Hispanic American Organization ("HAO").  (R. 955).

On discharge, Plaintiff denied any hallucinations or suicidal ideations and plans. (R. 954).

On May 3, 2018, Plaintiff returned to Easton Hospital's emergency room.  (R. 853).

According to the hospital records, "[t]he patient presents with depression, anxiety and . . . with

history of depression, states she is on medication from her primary care doctor who presents

complaining of worsening depression, crying, having trouble sleeping."  (R. 853).  Plaintiff

denied suicidal or homicidal ideation.  (*Id.*).  She stated she did not want to be hospitalized but

did wish to meet with a psychiatrist or therapist in the emergency department.  (*Id.*).  The onset

was chronic, and her symptoms were worsening and fluctuating in intensity, although they were

found to be minimal in degree.  (*Id.*).  Plaintiff was cooperative, non-suicidal, and tearful.  (R.

854).  Diagnosed with depression and insomnia, she was informed that there was no psychiatrist

in the emergency department, and the physician's assistant discussed with Plaintiff her

prescription for Ambien and possible outpatient treatment (R. 853-55).

Beginning in June 2018, Omni Health Services provided Plaintiff treatment for her

depression and anxiety.  (R. 714-808, R. 917-33).  Omni Health Services' Biopsychosocial

Assessment indicated that, as of the date of her initial assessment on June 27, 2018, Plaintiff was

taking Neurontin, Prozac and Trazadone, which were prescribed by Dr. Peri.  (R. 722).  She

presented with several complaints (including anxiety and inability to find pleasure in anything).

(R. 721).  Plaintiff denied suicidal or homicidal ideation.  (R. 722).  Her mental status

examination showed non-remarkable findings except for a depressed and anxious mood, flat

affect, and anhedonia.  (R. 718-19, 729-30).  Plaintiff was diagnosed with major depressive

disorder, recurrent, severe.  (*Id.*).  A treatment plan was prepared, which included three months

11

of "client-centered" and "cognitive" therapy for her depression and anxiety and medication management.  (R. 760).

From the last week of June 2018 until the final week of September 2018, Plaintiff attended weekly therapy sessions with an Omni Health Services clinician (Georgina Diaz, M.A.) (R. 787-90, 798-808).  Her mental health examinations were generally normal, except for an inability to maintain good contact, feelings of anxiety, and a flat affect.  (*Id.*).  Plaintiff was prescribed Ambien, Buspar, Neurontin, Prozac, Trazadone, and Xanax.  (R. 714, 717, 720, 798, 917-19).

Plaintiff returned for a third time to Easton Hospital's emergency room on May 7, 2019, arriving via EMS from the Social Security office.  (R. 1081).  Requesting inpatient psychiatric care for her depression, she presented with complaints of anxiety, tearfulness, poor appetite, and poor sleep.  (R. 1038, 1081).  According to the case manager's notes, Plaintiff denied suicidal ideation, homicidal ideation, or hallucinations.  (R. 1038).  However, Plaintiff "has passive suicidal thoughts," and she reported "hearing voices which she heard yesterday; pt stated the voices say, 'Haha.'"  (*Id.*).  There were visible abrasions on both wrists, but her physical examination and lab results were otherwise unremarkable.  (R. 1034-38).  Plaintiff was found to be alert, oriented, tearful, sad, and with low speech.  (*Id.*).

Plaintiff was transferred to Haven Behavioral Hospital on May 7, 2019.  (*Id.*).  Diagnosed with major depressive disorder without psychosis, she received inpatient psychiatric treatment through May 18, 2019.  (R. 909-16, 934-38).  She was discharged with a prescription for Prozac, and the discharge form indicated that Omni Health Services was to provide follow-up treatment. (R. 909, 916).

## B.    Non-Medical Evidence

12

In an Adult Function Report dated October 5, 2016, Plaintiff described her ADLs as consisting of basic personal care requiring assistance and reminders from a friend.  (R. 416).  She also indicated that she does not take care of anyone else, take care of any pets, or help anyone else to do so.  (R. 417).  Her pain and illness affect her sleep.  (*Id.*)  She does not do any household chores and needs help to perform such activities.  (R. 418-19).  She drives to appointments by herself, but her friend does the food shopping.  Plaintiff is able to pay bills, count change, and handle a savings account.  (R. 420).  Listing her hobbies and interests as exercise and watching television, she added that she never does "these things" due to her pain and illness.  (*Id.*).  Although she stated that she no longer socializes, she does talk with others at least once or twice a month and goes to church when the pain permits.  (R. 420-21).  Plaintiff further stated that, "[d]ue to pain and illness my mood changes and I snap at people."  (R. 421).  She indicated that she has problems paying attention, finishing what she started, and remembering things.  (R. 422-23).  She did state that she can follow spoken and written instructions, but she added that "I get anxious, depressed, in a bad mood and cannot function."  (R. 423).

At the November 15, 2018 administrative hearing, Plaintiff testified that she drives to her medical appointments but can get dizzy, does not have any hobbies, does not engage in social activities or socialize, no longer attends church, does not garden or do yardwork, does not use a computer, and does not use a smart phone except to speak occasionally with her mother.  (R. 51, 54-56).  She does some limited housework and, with the help of her mother and daughter, occasionally cooks.  (R 51-52, 56-58).  She occasionally goes grocery shopping and to restaurants with her children and husband.  (R. 52, R. 55, 57).

According to Plaintiff's testimony, she has depression and feels "[p]anic when there are many people."  (R. 52).  She treated with Dr. Alvarez for more than two years following her work-related accident in 2011 until she moved to Pennsylvania.  (R. 52-53).  Plaintiff then began seeing "Georgina" following her stay at the hospital.  (R. 53-54).  Plaintiff explained that she was hospitalized twice, once in January 2018 for "around 15 days, and another one recently," because she was "listening" to "voices" telling her "[t]o take attempt against my life again."  (R. 53).  Her depression seriously affects her ability to work because: "I was afraid, I was in panic.  I was feeling someone was after me to kill me."  (R. 54).  Sometimes, she does not want to get out of bed, and she has difficulty every day around other people and adapting to changes because "I don't want anyone to talk to me, or question me, or anything," which makes her "aggressive." (*Id.*).  She also has trouble concentrating and cannot pay attention to a thirty-minute television program in its entirety.  (R. 55).

Plaintiff testified at the February 20, 2020 hearing that she was separated from her husband and lives with her son.  (R. 69).  She does not drive much, has no hobbies, "[s]ometimes" engages in social activities like "visiting friends or relatives," and no longer attends church.  (R. 71).  She does not garden or do yardwork but does do household chores with her son's help and occasionally shops for groceries.  (R. 71-72).  She "cannot concentrate sometimes."  (R. 72).  Plaintiff further stated that she has suffered from depression, sleeping issues, and feelings of tiredness, sadness, and emptiness.  (R. 72-73, 76).

### III.    ALJ's Decision

Following the Appeals Council remand and the second administrative hearing, the ALJ issued a decision in which he made the following findings:

14

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since April 27, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: Degenerative Disc Disease (DDD) of the lumbar spine, bilateral carpal tunnel syndrome, Major Depressive Disorder, and Generalized Anxiety Disorder.   (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequent, but not continuous use of the upper extremities (*e.g.*, reaching, handling, and fingering).  Further, the claimant is limited to simple, routine, and repetitive tasks.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on January 3, 1976 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the

claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, 416.969a).

11.     The clamant has not been under a disability, as defined in the Social Security Act, from April 27, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 28-39).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 39).

## IV.     LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the burden of establishing steps one through four.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the

Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.      DISCUSSION

### A.      Listings at Step Three

In her request for review, Plaintiff raises a single claim: "The RFC determination lacks substantial evidence and is the product of legal error because the ALJ . . . failed to properly weigh the opinion evidence," including three opinions proffered by Plaintiff's treating psychiatrist, Dr. Alvarez, concerning her mental limitations.  (Pl.'s Br., ECF No. 13, at 1, 3-4).  Although she generally couches her claim as a challenge to the ALJ's RFC determination (*see id.* at 3-10, 11-12), Plaintiff specifically asserts that, at step three, "[t]he ALJ's failure to properly weigh Dr. Alvarez's opinion was harmful as Plaintiff would have been found to have met

Listings 12.04 and 12.06 had the ALJ properly weighed Dr. Alvarez's opinion." (*Id.* at 10) (citing R. 28-30). I agree with Plaintiff that the ALJ's decision to accord little weight to Dr. Alvarez's March 28, 2017 opinion is not supported by substantial evidence and that the ALJ thereby failed to comply with the applicable rule governing the weight to be accorded the opinion of a treating physician. I also agree with Plaintiff that the Acting Commissioner's argument that "objective medical evidence" supports the ALJ's findings constitutes a post-hoc rationalization that cannot be considered at this stage of the proceeding. Accordingly, I shall remand the matter for further proceedings at step three.

### 1.    "Conservative and Routine" Treatment

At step three, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings that prevent an adult, regardless of age, education, or work experience, from performing any gainful activity. 20 C.F.R. §§ 404.1525(a), 416.925(a). This inquiry functions to identify those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background, making further inquiry unnecessary. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). The claimant bears the burden of producing medical findings showing her impairments meet or medically equal a listed impairment. *See Burnett*, 220 F.3d at 120 n.2. To meet this burden, the claimant must establish all the requirements of the relevant listing. *Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify"); *see also Hartung v. Colvin*, No. 12-6155, 2016 WL 2910096, at *5 (E.D. Pa. May 19, 2016). Meeting a listing cannot be based on diagnoses alone. 20 C.F.R. §§ 404.1525(d); 416.925(d). Because matching or equaling a listing at step three results in an automatic finding of disability, the listings are strictly construed against claimants. *See Sullivan*, 493 U.S. at 530-32.

The ALJ identified Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders) as relevant to Plaintiff's mental health impairments. (R. 28-30). The ALJ recognized that, to satisfy the "paragraph B" criteria for the two listings, the mental impairments must result in at least one extreme or two marked limitations in the following areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. (R. 28-29). He found that Plaintiff's mental impairments were not sufficiently severe to meet the criteria. (R. 29, 34). Stating that mental status testing showed mostly intact memory with some reports of diminished ability, the ALJ determined that Plaintiff, given the benefit of the doubt, had a mild limitation in understanding, remembering, or applying information. (*Id.*). In interacting with others, the ALJ found a mild limitation noting that the record showed some social isolation and problems with interpersonal interactions, but that Plaintiff was able to adequately interact with treating and examining sources, family members, and others. (*Id.*). With regard to concentrating, persisting, or maintaining pace, he found that Plaintiff has a moderate limitation. (*Id.*). According to the ALJ, the record also indicated some impairment in concentration, and the ALJ "giving the claimant the full benefit of the doubt," found a moderate limitation in this area. (*Id.*). Finding that any decrease in ability is primarily due to her physical impairments and that the RFC adequately accommodated any physical impairments, the ALJ determined that Plaintiff's mental impairments resulted in a mild limitation with respect to adapting or managing oneself. (*Id.*).

In his summary of the medical records, the ALJ recognized that Plaintiff's mental health treatment consisted of both therapy and psychotropic medications, adding that "stability [was] noted" as to the medications prescribed by Omni Health Services. (R. 31-32). He also found

that, "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the record does not support them."  (R. 34). According to the ALJ, "treatment for the claimant's mental impairments has been conservative, with the exception of the in-patient psychiatric hospitalizations previously mentioned."  (*Id.*). "The undersigned further notes that even with these psychiatric hospitalizations, the claimant's condition quickly returned to baseline."  (*Id.*).

The ALJ specifically considered Dr. Alvarez's MSS dated March 28, 2017:

> Dr. Alvarez provided an MSS dated March 28, 2017, in which she opined that the claimant has moderate limitation with respect to her ability to interact appropriately with the public ([R664-66]).  The doctor further opined that the claimant has marked limitation with respect to her ability to understand, remember, and carry out simple instructions, as well as making judgment on simple work-related decisions.  Finally, Dr. Alvarez opined that the claimant has an extreme limitation with respect to her ability to understand, remember, and carry out detailed instructions, and make judgments on complex work-related decisions.  The undersigned gives this opinion little weight, because the evidence does not support such extreme limitations. Specifically, the mental status examination results show while the claimant exhibited depression and anxiety, her care overall was conservative and routine.

(R. 35) (footnotes omitted).  Dr. Alvarez also opined that, with respect Plaintiff's ability to interact with supervisors, co-workers, and the public, and to respond to changes in the routine work setting, she had marked limitations in interacting appropriately with both supervisors and co-workers and in her ability to respond appropriately to usual work situations and to changes in a routine work setting.  (R. 665).

The ALJ thereby provided only one specific reason for why he accorded little weight to Dr. Alvarez's March 28, 2017 opinion—the "conservative and routine" nature of Plaintiff's care. Plaintiff argues that the ALJ's rejection of her treating psychiatrist's opinion is not supported by

substantial evidence because his depiction of her treatment as "conservative and routine" is a mischaracterization of the record given the treatment that she actually received.  (Pl.'s Br., ECF No. 13, at 7-9; Pl.'s Reply Br., ECF No. 17, at 2-4).  She emphasizes that, in addition to receiving individual psychotherapy and numerous doses of psychotropic medications for a period of at least four years, she "had required inpatient hospitalization on several occasions, including on January 16 to 30, 2018, and May 7, 2019."  (*Id.*) (citing R. 939-57, 1081).  The Acting Commissioner counters that the ALJ "gave good reasons for the weight [he] assigned to [Dr. Alvarez's] opinions."  (Def.'s Br., ECF No. 16, at 6-8) (emphasis added).  The Acting Commissioner contends that the ALJ "was right" because Plaintiff did not begin to receive treatment for a mental impairment until 2013 despite claiming that her symptoms began in 2011 and Dr. Alvarez's treatment for the next four years "consisted solely of occasional therapy and periodic medication checks where Dr. Alvarez rarely adjusted Plaintiff's medications." (*Id.* at 7-8).  Plaintiff then briefly received treatment at Omni Health Services in the form of "medication checks [with stability noted] and therapy."  (*Id.*)  Finally, the Acting Commissioner asserts that Plaintiff sought "emergency treatment" on "just two occasions during a nine-year period" and then quickly returned to "baseline."  (*Id*) (citing R. 34, 953-54).  In her reply brief, Plaintiff emphasizes that she received years of mental health treatment yet was hospitalized twice within a period of approximately one year.  Even when Plaintiff returned to "baseline," she continued to require therapy and psychotropic drugs.  (Pl.'s Reply Br., ECF No. 17, at 3-4).

I conclude that the critical finding by the ALJ – that Plaintiff underwent "conservative and routine" care - is not supported by substantial evidence.

It is well established that an individual's treatment is relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3).  But the ALJ's assessment of this treatment, like any other findings of fact, must be backed by substantial evidence.  *See, e.g.*, *Hartranft*, 181 F.3d at 360.  Courts within this Circuit have repeatedly rejected characterizations of treatment as "routine," "conservative," or "minimal" in cases where the claimant, although not hospitalized, was being treated with a combination of psychotropic medications and psychotherapy.  *See, e.g.*,  *Lofton v. Kijakazi*, No. 21-4284, 2023 WL 1993677, at *9, 11 (E.D. Pa. Feb. 14, 2023) (finding that the ALJ's description of mental health treatment as "minimal" constituted a mischaracterization of the record given the claimant's prescriptions for various psychotropic drugs); *Cordero v. Kijakazi*, 597 F. Supp. 3d 776, 799 (E.D. Pa. 2022) ("[U]nlike a claimant who has been treated for a mental impairment with only talk therapy, Ms. Cordero has been treated with countless doses of psychotropic medications in an effort to control her severe bipolar disorder, anxiety, and depression.").

Here, Plaintiff's treatment for her mental impairments consisted of more than five years of psychotherapy and psychotropic medications.  (R. 509-10, 518-59, 615-29, 639-40, 714-808, 853-55, 860, 897-919, 934-57, 1038).  Since 2013, Dr. Alvarez, Plaintiff's primary care physician, and mental health professionals at Brook Glen Behavioral Hospital, Omni Health Services, and Haven Behavioral Hospital have prescribed multiple psychotropic medications, including Ambien, Buspar, Elavil, Neurontin, Prozac, Thiamine, Trazadone, Vistaril, Xanax, and Zyprexa.  (R. 509-10, 527-28, 533-36, 544-47, 550-53, 558-59, 615-29, 897-905**)**.  Dr. Aranda provided Plaintiff with sixteen sessions of anxiety management and supportive therapy from January 2013 through November 2016.  (R. 519, 521, 523-24, 526, 530, 532, 538-41, 543, 549, 555, 557). Plaintiff subsequently had weekly "client-centered" and "cognitive" therapy sessions at Omni Health Services from June 2018 through September 2018.  (R. 787-90, 798-806).  Yet,

despite this treatment, she went to the emergency room and was hospitalized on several

occasions for her mental health impairments.  (R. 823-24, 826-27, 853-55, 860, 893-94, 909-16,

909-16, 934-79, 1038, 1081).

The ALJ and Acting Commissioner point out that Plaintiff's treatment at Omni Health

Services consisted of medication management "with stability noted."  (Def.'s Br., ECF No. 16, at

7) (citing R. 715-16, 718, 729, 779, 798, 928, 931, 962).  The Acting Commissioner also

emphasizes that Dr. Alvarez "made few medication adjustments throughout the four years during

which she treated Plaintiff."  (*Id.*) (citing R. 615-26).  But "[m]uch treatment of mental disorders

involves medication management."  *Baker v. Astrue*, No. ED CV 09-01078 RZ, 2010 WL

682263, at *1 (C.D. Cal. Feb. 24, 2010).  Even if Plaintiff's mental health treatment included

"medication management with stability noted" and relatively minor changes in the medications

and dosages prescribed (*see* R. 615-16, 618, 621, 623-24, 903, R. 917, 919),  substantial evidence

does not support the ALJ's finding of "conservative and routine treatment," because, in addition

to several years of psychotropic medications, the Plaintiff received years of psychotherapy and,

on multiple occasions, went to the emergency room and/or was hospitalized for inpatient

psychiatric care.  (R. 519, 521, 523-24, 526, 530, 532, 538-41, 543, 549, 555, 557, 787-90, 798-

806. 823-24, 826-27, 853-55, 860, 893-94, 909-16, 909-16, 934-79, 1038, 1081).

In fact, the treatment at issue in this proceeding exceeds the level of care in cases like

*Cordero*.  In the above-cited cases, the respective claimants were not hospitalized for psychiatric

care—yet these courts rejected the ALJs' respective findings that the treatment at issue was

conservative, routine, or minimal.  *See, e.g.*, *Lofton*, 2023 WL 1993677, at *11, *14 (noting that

ALJ specifically referred to fact that plaintiff was never hospitalized); *Cordero*, 597 F. Supp. 3d

at 799.  In contrast, Plaintiff went to the emergency room three times and was hospitalized for her mental health impairments on two occasions.

Specifically, the ALJ acknowledged that Plaintiff went to Easton Hospital's emergency room due to her mental health issues on January 16, 2018, May 3, 2018, and May 7, 2019, presenting (with the exception of the May 3, 2018 visit) with claims of auditory hallucinations and suicidal ideation.  (R. 32-33; *see also* R. 823-24, 826-27, 853-55, 860, 893-94, 1038, 1081). In fact, Plaintiff went to the emergency room on January 16, 2018 because "she has been hearing voices telling her to kill herself."  (R. 826).  Admitted to Brook Glen Behavioral Hospital the next day, she said she had planned on killing herself by overdosing on her medications, and she then received inpatient psychiatric care from January 17, 2018 through January 30, 2018.  (R. 939-79).  Plaintiff subsequently returned to the emergency room at Easton Hospital on May 7, 2019, saying that she "has passive suicidal thoughts" and was "hearing voices which she heard yesterday."  (R. 1038).  "[Plaintiff] stated the voices say, 'Haha.'"  (*Id.*).  Plaintiff was again hospitalized for inpatient psychiatric care at Haven Behavioral Hospital from May 7, 2019 through May 18, 2019.  (R. 909-16, 934-39, 1038).

The Acting Commissioner states in a footnote that "the ALJ acknowledged that Plaintiff's treatment was conservative 'with the exception of the episodic in-patient hospitalizations previously mentioned.'"  (Def.'s Br., ECF No. 16, at 8 n.3) (citing R. 34).  The ALJ thereby appeared to recognize that Plaintiff's "in-patient psychiatric hospitalizations" were "exceptions" to his own characterization of the "overall" treatment as "conservative" and "routine."  But "[t]he ALJ's reasons for her findings must build 'a logical bridge between the evidence and the result.'"  *Haut v. Colvin*, Civ. 15-511, 2016 WL 3962020, at *11 (W.D. Pa. Jul. 19, 2016) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).  The ALJ did not

24

explain how exactly mental health treatment could be characterized as "conservative and routine" *except for* two psychiatric hospitalizations.  At best, the ALJ indicated that the hospitalizations should be discounted because they were "episodic," she quickly returned to "baseline," and accordingly "her care overall was conversative and routine."  (R. 34-35) However, Plaintiff was still hospitalized for more than ten days on two separate occasions for suicidal ideation and auditory hallucinations less than a year and a half apart, despite having received (and continuing to receive) more than five years of mental health treatment.  (R. 509-10, 518-59, 615-29, 639-40, 714-808, 853-55, 860, 897-919, 934-57, 1038).  The Haven Behavioral Hospital records for her second hospitalization are also the most recent medical documents in the administrative record.  Additionally, even if Plaintiff thereby returned to some sort of "baseline," it is a mischaracterization of the record to label this baseline as "conservative and routine" where it included both "talk therapy" and "countless doses of psychotropic drugs," *Cordero*, 597 F. Supp. 3d at 799.

## 2.    The "Treating Physician" Rule

This mischaracterization of the evidence also implicates the standard governing the weight that should be accorded the opinion of a treating physician.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  According to Plaintiff, the ALJ failed to weigh the opinion of Dr. Alvarez in accordance with the "treating physician's rule."  (Pl.'s Br., ECF No. 13, at 6-7, 9-10). The Acting Commissioner responds that the ALJ did acknowledge Dr. Alvarez's status as a treating provider.  (Def.'s Br., ECF No. 16, at 10).

Because Plaintiff filed her application for benefits before March 27, 2017,[3] medical opinions are assessed according to 20 C.F.R. § 404.1527.  Treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *Fargnoli v. Massanari*, 247 F. 3d 34, 43 (3d Cir. 2001).  Under the applicable standard, a treating physician's opinion is entitled to controlling weight if it is found to be well supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Even if not entitled to controlling weight, the ALJ may also give more or less weight to a treating physician's opinion based on, among other things, the consistency of the opinion with the records as a whole and the support and explanation offered by the physician.  20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6).  Regardless of what weight the ALJ assigns to medical opinions, the ALJ must adequately explain the evidence he rejects or affords lesser weight.  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review."  *Burnett*, 220 F.3d 119-20.

The ALJ found that Dr. Alvarez's opinion concerning Plaintiff's mental impairments was entitled to little weight "because the evidence does not support such extreme limitations," i.e., "her care overall was conservative and routine."  (R. 35).  Because substantial evidence does not support the ALJ's critical finding of "conservative and routine" treatment, Dr. Alvarez's opinion was "not inconsistent" with other "substantial evidence" in the record or "the records as a whole"

---

[3]  The regulations providing for the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017.  *See* 20 C.F.R. § 404.1520c (prescribing rules for new decisions which apply to claims filed on, or after, March 27, 2017).  The amended regulations are not applicable to this case.

(and neither the ALJ nor the Acting Commissioner have called into question Dr. Alvarez's clinical techniques), 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

### 3.    The Acting Commissioner's "Objective Medical Evidence" Argument

The Acting Commissioner argues that, "[i]n addition to the relatively conservative treatment Plaintiff received," the "objective medical evidence"—including Plaintiff's "waxing and waning" symptoms and "unremarkable" mental status examinations—and the opinions of the consultative examiner (Dr. Porcelli) and the state agency psychologist (Dr. Harding) support the ALJ's findings.  (Def.'s Br., ECF No. 16, at 8-10).  Plaintiff asserts that the Acting Commissioner's argument "is nothing more than a *post-hoc* rationalization of the evidence that Defendant is not permitted to proffer."  (Pl.'s Reply Br., ECF No. 17, at 5).  Plaintiff is correct.

"The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision; the Commissioner may not offer a post-hoc rationalization."  *Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) (internal quotations omitted).  The ALJ did reference the Plaintiff's "waxing and waning" symptoms and the results of her mental health examinations in his summary of the medical records.  (R. 30-32).  He also relied on the "mostly unremarkable mental status examinations" in order to accord little weight to Dr. Alvarez's "multiple Doctor's Progress Notes" submitted in connection with Plaintiff's New York Worker's Compensation claim, in which she opined that Plaintiff could not return to work due to continued symptoms.  (R. 34) (citing R. 509-10, 533-36, 544-45, 550-53, 558-59).  The ALJ likewise relied on Plaintiff's "relatively benign clinical findings" as the reason he accorded great weight to the opinions of Dr. Harding and Dr. Porcelli, adding that "[a]lthough the claimant presented with a depressed mood, the record showed some improvement in the intensity of said depression as previously discussed."  (R. 34-35).  However, none of these grounds were offered by the ALJ as reasons for

27

why he was discounting Dr. Alvarez's March 28, 2017 opinion, and the Court accordingly cannot rely on such grounds as a basis for upholding the ALJ's determination to give little weight to the treating psychiatrist's opinion. *See Schuster*, 879 F. Supp. 2d at 466. The ALJ accorded the March 28, 2017 opinion little weight "specifically" because "her care overall was conservative and routine" (R. 35), and the Court has determined that this reason is not supported by substantial evidence.

.

### B. Plaintiff's Remaining Arguments

Plaintiff argues that the RFC determination is not supported by substantial evidence because of the ALJ's failure to properly weigh Dr. Alvarez's opinions. (Pl.'s Br., ECF No. 13, at 3-12; Pl.'s Reply Br., ECF No. 17, at 2-5). According to her, "even if Plaintiff was properly found to have not met listing 12.04 and 12.06, the ALJ's failure to properly evaluate Dr. Alvarez'[s] opinion was harmful as he further failed to present the vocational expert with a hypothetical question that accurately accounted for all of Plaintiff's impairments." (Pl.'s Br., ECF No. 13, at 12) (citing R. 77-80). She also contends that the ALJ's RFC determination is not supported by substantial evidence because he failed to properly weigh the opinions of Dr. Balmaceda and Dr. Long as to Plaintiff's physical impairments and such errors are harmful because the question presented to the vocational expert thereby did not account for all of her physical impairments. (*Id.* at 3-4, 12-19; Pl.'s Reply Br., ECF No. 17, at 5-8). However, the Court need not decide whether any of these issues—which would be addressed later in the five-step analysis—constitute a basis for remand. If the ALJ determines on remand that the Plaintiff has met a listing at step three, no further analysis will be required. *See, e.g.*, *Milliman v. Berryhill*, No. 16-1279-LPS-MPT, 2017 WL 3912830, at *8 (D. Del. Sept. 7, 2017) ("Analysis

stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*."); *see also Steinninge*r *v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ  may reverse his findings after remand).

## VI.    CONCLUSION

For the foregoing reasons, I find that the ALJ erred because: (1) the ALJ's decision to accord little weight to Dr. Alvarez's March 28, 2017 opinion is not supported by substantial evidence, and (2) he thereby did not properly apply the "treating physician" standard.  . Accordingly, Plaintiff's request for review is **GRANTED** to the extent that it requests remand. This matter is remanded to the Acting Commissioner for further proceedings consistent with this memorandum.

BY THE COURT:

___/s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
United States Magistrate Judge